FILED
October 07, 2020
KAREN MITCHELL
CLERK, U.S. DISTRICT COURT

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
September 15, 2020
Lyle W. Cayce
Clerk

No. 19-10785

RALPH CLAY WALSH, JR.,

          *Plaintiff—Appellee*,

*versus*

LISA HODGE; JOHN SCHETZ; LISA KILLAM-WORRALL; JESSICA HARTOS; EMILY SPENCE-ALMAGUER; SUMIHIRO SUZUKI; VICTOR KOSMOPOULOS; MICHAEL R. WILLIAMS; PATRICIA GWIRTZ; DAMON SCHRANZ,

          *Defendants—Appellants*.

Appeals from the United States District Court
for the Northern District of Texas
USDC No. 4:17-CV-323-Y

Before DAVIS, JONES, and ENGELHARDT, *Circuit Judges*.

W. EUGENE DAVIS, *Circuit Judge*:

    Ralph Walsh, Jr., a former medical school professor at the University of North Texas Health Science Center ("University"), sued various professors and school administrators (collectively, "Defendants") under § 1983, alleging they violated his Fourteenth Amendment procedural due process rights. The Defendants voted to recommend firing Walsh after conducting a hearing to address a student's sexual harassment claim against

Case: 19-10785　　Document: 00515592543　　Page: 2　　Date Filed: 10/07/2020
Case 4:17-cv-00323-Y　　Document 55　　Filed 10/07/20　　Page 2 of 19　　PageID 2221

No. 19-10785

him. Walsh asserted that Defendants denied him both a fair tribunal and a meaningful opportunity to be heard. Defendants moved for summary judgment on the basis of qualified immunity, and the district court partially denied the motion. Because Walsh's deprivations of due process were not clearly established constitutional rights, we REVERSE the district court's denial of qualified immunity and RENDER judgment in favor of Defendants.

## I. BACKGROUND

Walsh is a doctor in osteopathic manipulative medicine (OMM) and family medicine. He served as an Assistant and Associate Professor for the University, where he both taught and engaged in clinical work from 2011 to 2015. The University could terminate Walsh before the expiration of his employment contract only for good cause.

In October 2014, Walsh attended a medical conference in Seattle with two fellow University faculty members and two medical students. The conference included a formal banquet consisting of a reception, dinner, and dancing. All parties consumed alcohol, and the evening soon became "festive and somewhat boisterous."

When the conference ended and the parties returned to Texas, one of the two students, Student #1, promptly filed a Title VII complaint with the University. She alleged Walsh sexually harassed her at the banquet. The University hired attorney Lisa Kaiser to investigate Student #1's complaint. Kaiser interviewed all parties and prepared a report documenting the allegations, along with details of her investigation and an ultimate recommendation.

Kaiser's report detailed the evening from Student #1's perspective. Student #1 "complained that Dr. Walsh put his arm around her, rubbed her back and touched her buttocks after the dinner service." Student #1 also observed Walsh "standing behind her while she was sitting, and he was

Case: 19-10785   Document: 00515592543   Page: 3   Date Filed: 10/07/2020
Case 4:17-cv-00323-Y   Document 55   Filed 10/07/20   Page 3 of 19   PageID 2222

No. 19-10785

looking down her dress," becoming more aggressive as the evening wore on. She reported feeling uncomfortable, especially when Walsh repeatedly asked "whether he should come to her room." Student #1 explained that while she felt "embarrassed" and "ashamed," she did not want to leave or be "that student" who did not participate; she "did not know what to do at the time."

Student #1 also expressed unease over an email Walsh sent her the morning after the banquet. Part of the email read, "Hi. Are you and [Student #2] still here? You are welcome to do some hands-on training with me at OES." Student #1 understood the phrase "hands-on training" to be sexually suggestive and left the conference two days early as a result. She explained that, upon returning to school, she still felt "embarrassed" and "distracted," and she no longer wanted to come to campus. She stressed that Walsh, as her professor, should have been someone whom she could trust.

Kaiser next interviewed the other parties present that evening: Student #2, Faculty Member #1, and Faculty Member #2. Student #2 confirmed that Student #1 looked "uncomfortable." Faculty Member #1 and #2 saw the controversy differently. Faculty Member #2 said she did not see anything inappropriate. She explained Walsh's behavior by reasoning that the medical profession is "very handsy" with "quite a bit of hugging," but that students are in a "different mindset," and she could see "how students can misinterpret." She argued that Student #1 "could have left without making a scene" had she wished. Faculty Member #1 echoed Faculty Member #2's statements, remarking that "nobody left the event crying." But he also recalled walking Student #1 back to her room at her request, because she feared Walsh would be waiting for her when she got there.

Kaiser next interviewed Walsh, who contested Student #1's depiction of the evening. He stressed the flirtation was mutual—Student #1 at no point communicated her unease to him. Indeed, he claimed she reciprocated his advances: she sat on his hand, danced with him, and held hands throughout the evening. He argued photos from the evening corroborated that Student

Case: 19-10785    Document: 00515592543    Page: 4    Date Filed: 10/07/2020
Case 4:17-cv-00323-Y   Document 55   Filed 10/07/20   Page 4 of 19   PageID 2223

No. 19-10785

#1 was at no point uneasy. He only asked to walk her to her room because he worried she had too much to drink; moreover, she replied, "Maybe. I don't know. I'll let you know," portraying no discomfort. As to the email he sent the next morning, Walsh explained he sought to tell Student #1 in person that he regretted their flirtation, since he is a married man. "Hands-on training" carried no double entendre, he clarified, because this terminology is frequently used by the OMM group. After hearing from Walsh, Kaiser re-interviewed Student #1.

Kaiser's report concluded that the interviews substantiated Student #1's allegation. Kaiser sent her report to the Dean of the University, who then recommended Walsh's termination. Walsh learned of Kaiser's report and the decision to take disciplinary action, and he appealed the decision to the University's Faculty Grievance and Appeal Committee ("Committee").

Soon thereafter, Patricia Gwirtz, Chair of the Committee, sent Walsh a letter outlining the charges against him, a list of the Committee's witnesses, and the evidence it planned to consider. The letter also informed Walsh he could set up an appointment to review Kaiser's report and take notes. The Committee gave Walsh 90 minutes to present his case.

During the next five weeks, Walsh reviewed Kaiser's redacted report twice, and he prepared a five-page letter to the Committee outlining his defenses. Walsh sought to circulate photos from the banquet that he believed was evidence that Student #1 welcomed his flirtations, but Gwirtz determined they were not relevant.

The Committee consisted of eight voting members and Gwirtz, who served as chair with a tiebreak vote. Kaiser testified first at the hearing. She answered the Committee's questions, echoing her findings and explaining how she went about interviewing the parties.

Walsh was not represented by counsel at the hearing but was accompanied by a fellow professor, Dr. Gamber. On cross-examination,

Case: 19-10785   Document: 00515592543   Page: 5   Date Filed: 10/07/2020
Case 4:17-cv-00323-Y   Document 55   Filed 10/07/20   Page 5 of 19   PageID 2224

No. 19-10785

Walsh challenged Kaiser's account of the evidence, which he argued ignored his side of the story.

Walsh then offered his account of the evening. Much of his testimony was spent explaining that he viewed their interactions as mutual flirtation, and repeatedly urged that Kaiser's report was "inaccurate" and biased. At numerous points, Walsh sought to bring up the photos from the evening but was refused each time.

The University offered two other witnesses: Dean Don Peska, who outlined the charges against Walsh and produced evidence on behalf of the University, and Director of Human Resources Dana Perdue, who explained the University's investigative process. Walsh, meanwhile, called Julie Innmon, a labor and employment attorney with experience conducting sexual harassment investigations; she testified to the procedural deficiencies of the hearing. Walsh had two other witnesses who spoke to his character, as well as six other character witnesses who provided written testimony to the Committee.

When the hearing concluded, the Committee found that Walsh's conduct violated the provisions of the University's Faculty Policy by a 6-0-2 vote and the University's Faculty Bylaws by a unanimous vote. The Committee recommended that Walsh be terminated for violating the University's Policy No. 05.205, Sexual Harassment, and Article XIII of the University's Faculty Bylaws. The University Provost, after reviewing the record, agreed with the Committee and recommended to the University's President that Walsh should be terminated. Walsh was given the opportunity to appeal this decision. Walsh submitted another letter to appeal the Committee's finding, but the President agreed with the Committee and terminated Walsh five months before the end of his year-long contract.

Walsh filed a § 1983 suit against the University and its faculty members/administrators involved in his termination, each in his or her individual capacity. The University officials moved for summary judgment

No. 19-10785

on grounds that they did not violate Walsh's procedural due process rights and were entitled to qualified immunity. The district court partially granted Defendants' motion, holding that Walsh was adequately apprised of the charges against him. The court otherwise denied the motion. Defendants timely appealed the court's ruling that they were not entitled to qualified immunity.

## II. DISCUSSION

### A. Standard of Review

We first address our jurisdiction to hear this appeal. While a denial of summary judgment is not a final judgment, the Supreme Court has held that it may be considered a collateral order capable of immediate review when (1) the defendant is a public official asserting qualified immunity, and (2) "the issue appealed concerned, not which facts the parties might be able to prove, but, rather, whether or not certain given facts show a violation of 'clearly established' law."[1]

"A denial of summary judgment based on qualified immunity is reviewed *de novo*."[2] Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3] When assessing an interlocutory appeal for qualified immunity, however, we cannot review a district court's conclusions that a genuine issue of fact exists concerning whether a defendant engaged in certain conduct.[4] We must instead "review the complaint and record to determine whether, assuming that all of [plaintiff's] factual assertions are true, those facts are materially sufficient to establish

---

[1] *Johnson v. Jones*, 515 U.S. 304, 311 (1995) (citation omitted).

[2] *Wallace v. Cty. of Comal*, 400 F.3d 284, 288 (5th Cir. 2005).

[3] Fed. R. Civ. P. 56(a).

[4] *Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc).

that defendants acted in an objectively unreasonable manner."⁵ In other words, "we can review the *materiality* of any factual disputes, but not their *genuineness*."⁶

This analysis requires two steps. First, we must determine whether Walsh suffered a violation of his procedural due process rights as a matter of law.⁷ Second, we must decide whether the Defendants' conduct was objectively unreasonable in light of clearly established law at the time of the incident.⁸ "Courts have discretion to decide which prong of the qualified-immunity analysis to address first."⁹ While courts should "think hard" before addressing the constitutional question, "it remains true that following the two-step sequence—defining constitutional rights and only then conferring immunity—is sometimes beneficial to clarify the legal standards governing public officials."¹⁰

### B. Walsh's Procedural Due Process Rights

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."¹¹ The Supreme Court has held that procedural due process is implicated when a university terminates a public employee dismissible only for cause.¹² In determining what process is due, "[i]t is not the role of the

---

⁵ *Wagner v. Bay City*, 227 F.3d 316, 320 (5th Cir. 2000).

⁶ *Id.*

⁷ *Hare v. City of Corinth*, 135 F.3d 320, 325 (5th Cir. 1998).

⁸ *Id.*

⁹ *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc).

¹⁰ *Camreta v. Greene*, 563 U.S. 692, 707 (2011).

¹¹ *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

¹² *Gilbert v. Homar*, 520 U.S. 924, 928–29 (1997); *Mathews*, 424 U.S. at 333. Defendants try to draw a distinction between Walsh, a contract employee who could only

Case: 19-10785   Document: 00515592543   Page: 8   Date Filed: 10/07/2020
Case 4:17-cv-00323-Y   Document 55   Filed 10/07/20   Page 8 of 19   PageID 2227

No. 19-10785

federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion."[13]

In *Levitt v. University of Texas at El Paso*, we held that due process protections for a terminated professor include the following:

> (1) be advised of the cause for his termination in sufficient detail so as to enable him to show any error that may exist; (2) be advised of the names and the nature of the testimony of the witnesses against him; (3) a meaningful opportunity to be heard in his own defense within a reasonable time; and (4) a hearing before a tribunal that possesses some academic expertise and an apparent impartiality toward the charges.[14]

We evaluate due process using a sliding scale the Supreme Court first introduced in *Mathews v. Eldridge*.[15] Courts must balance (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the

---

be fired for cause, and a tenured employee. While the Court in *Gilbert* addressed "tenured" professors, it also stressed that "public employees who can be discharged *only for cause* have a constitutionally protected property interest in their tenure." 520 U.S. at 928–29 (emphasis added). *See also Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) (teacher recently hired without tenure or a formal contract, but nonetheless with a clearly implied promise of continued employment, had a property interest safeguarded by due process). The Supreme Court has also held that due process may be implicated when termination "might seriously damage [a professor's] standing and associations in his community." *Id.* at 573.

[13] *Wood v. Strickland*, 420 U.S. 308, 326 (1975).

[14] 759 F.2d 1224, 1228 (5th Cir. 1985).

[15] *Mathews*, 424 U.S. at 335.

No. 19-10785

fiscal and administrative burdens that the additional or substitute procedural requirement would entail."[16]

At issue here is whether Walsh had a meaningful opportunity to be heard and whether the University's tribunal was impartial. Walsh argues Defendants denied him his due process rights because: (1) Defendants permitted an allegedly biased committee member to hear his claim, and (2) Defendants did not allow him to confront his accuser and introduce photos from the evening, and instead relied on hearsay testimony from the University's investigator.

### 1. The Right to a Fair Tribunal

Walsh alleged that one of the Committee members, defendant Damon Schranz, was not impartial because he served as Student #1's preceptor, and spent time with her weekly in various clinics. The court denied summary judgment on that ground pending further discovery regarding the alleged bias (thereby granting Walsh's Rule 56(d) motion).

The Supreme Court has emphasized that a "fair trial in a fair tribunal is a basic requirement of due process."[17] Yet "bias by an adjudicator is not lightly established."[18] "The movant must overcome two strong presumptions: (1) the presumption of honesty and integrity of the adjudicators; and (2) the presumption that those making decisions affecting the public are doing so in the public interest."[19]

---

[16] *Id.*

[17] *Withrow v. Larkin*, 421 U.S. 35, 46 (1975) (quoting *In re Murchison*, 340 U.S. 133, 136 (1955)).

[18] *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1052–53 (5th Cir. 1997).

[19] *Id.*

9

Case: 19-10785      Document: 00515592543      Page: 10      Date Filed: 10/07/2020
Case 4:17-cv-00323-Y   Document 55   Filed 10/07/20   Page 10 of 19   PageID 2229

No. 19-10785

We have held that procedural due process requires proof of actual bias.[20] "Alleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences."[21] Walsh alleged that only one member of the eight-person Committee knew Student #1 from serving as one of her preceptors in medical school. That one Committee member knew the accuser in a university proceeding is not enough to establish a due process claim of bias in this instance. We find no merit to this argument.

### 2. The Right to Confront One's Accuser in a University Proceeding

Walsh argues next that Defendants denied him due process by not affording him the right to confront and cross-examine his accuser before the Committee. Defendants argue that the district court erred in agreeing with Walsh's argument. The court concluded that the Due Process Clause required Walsh be given the right to cross-examine his accuser to allow the Committee to evaluate her credibility; cross-examining Kaiser was not a reasonable substitute.[22] The district court then held Walsh's right to cross-examine Student #1 was clearly established at the time of the violation.

The first prong of qualified immunity requires us to address whether Walsh suffered a deprivation of procedural due process by not being permitted to cross-examine his accuser. At the outset, we recognize that the

---

[20] *Levitt v. Univ. of Tex. at El Paso*, 759 F.2d 1224, 1228 (5th Cir. 1985).

[21] *Duke v. N. Tex. State Univ.*, 469 F.2d 829, 834 (5th Cir. 1972).

[22] Walsh was found in violation of § 05.205(c) of the University's Policies. The policy states: "Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature (regardless of gender), even if carried out under the guise of humor, constitute a violation of this policy when such conduct has the purpose or effect of substantially interfering with an individual's academic or professional performance or creating an intimidating, hostile or offensive employment, or educational environment."

No. 19-10785

"interpretation and application of the Due Process Clause are intensely practical matters and . . . '(t)he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.'"[23] Indeed, "[t]he nature of the hearing should vary depending upon the circumstances of the particular case."[24]

To assess Walsh's claim, we turn to the *Mathews v. Eldridge* sliding scale. The first *Mathews* factor, Walsh's private interest, is significant: the loss of his employment. "[T]he denial of public employment is a serious blow to any citizen."[25] Moreover, the termination for sexual assault necessarily impacts future employment opportunities as an academic in a medical school, as a charge of sexual harassment inevitably tarnishes Walsh's reputation.[26]

The third *Mathews* factor, the University's interest, is also significant. Defendants argue the University has three public interests: (1) preserving the University's resources to serve its primary function of education, (2) protecting vulnerable witnesses, and (3) providing a safe environment for

---

[23] *Goss v. Lopez*, 419 U.S. 565, 578 (1975) (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961)).

[24] *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150, 158 (5th Cir. 1961).

[25] *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 589 (1972) (Marshal, J., dissenting). *See also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985) ("the significance of the private interest in retaining employment cannot be gainsaid"); *Jones v. La. Bd. of Sup'rs of Univ. of La. Sys.*, 809 F.3d 231, 237 (5th Cir. 2015) (terminated professor's interest in retaining job was "significant").

[26] *See, e.g.*, *Bd. of Regents of State Colleges*, 408 U.S. at 574 (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 185 (1951) (Jackson, J., concurring)) ("[t]o be deprived not only of present government employment but of future opportunity for it certainly is no small injury"); *cf. id.* (reasoning "there is no suggestion that the State, in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities"). *See also Ludwig v. Bd. of Trustees of Ferris State Univ.*, 123 F.3d 404, 410 (6th Cir. 1997) ("An injury to a person's reputation, good name, honor, or integrity constitutes the deprivation of a liberty interest when the injury occurs in connection with an employee's termination.").

Case: 19-10785   Document: 00515592543   Page: 12   Date Filed: 10/07/2020
Case 4:17-cv-00323-Y   Document 55   Filed 10/07/20   Page 12 of 19   PageID 2231

No. 19-10785

other members of the faculty and student body. We have recognized the importance of all three.

"To impose . . . even truncated trial-type procedures might well overwhelm administrative facilities in many places and, by diverting resources, cost more than it would save in educational effectiveness."[27] We have also held that universities have a "strong interest in the 'educational process,' including maintaining a safe learning environment for all its students, while preserving its limited administrative resources."[28] If Student #1 had to testify in front of the Committee, Defendants contend, this would discourage future students from coming forward. We have acknowledged the importance of supporting victims of sexual harassment: "Only when sexual harassment is exposed to scrutiny can it be eliminated; thus it makes sense to encourage victims of sexual harassment to come forward because . . . they are often the only ones, besides the perpetrators, who are aware of sexual harassment."[29]

This, then, leads us to the second *Mathews* factor: the risk of erroneously depriving Walsh of an important interest and whether additional or substitute safeguards could be implemented to mitigate the concern about having a student being confronted by her professor in front of a committee of his peers. Walsh underscores that the risk of erroneous deprivation of his rights, absent the Committee hearing Student #1's account more directly, is great. We agree that this is a particularly important interest in this case when

---

[27] *Goss*, 419 U.S. at 583. *See also Gorman v. Univ. of R.I.*, 837 F.2d 7, 15 (1st Cir. 1988) ("[I]t is no exaggeration to state that the undue judicialization of an administrative hearing, particularly in an academic environment, may result in an improper allocation of resources, and prove counter-productive.").

[28] *Plummer v. Univ. of Houston*, 860 F.3d 767, 773 (5th Cir. 2017), *as revised* (June 26, 2017).

[29] *E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 463 n.19 (5th Cir. 2013) (en banc) (brackets omitted) (quoting *Adams v. O'Reilly Auto., Inc.*, 538 F.3d 926, 933 (8th Cir. 2008)).

No. 19-10785

the entire hearing boiled down to an issue of credibility. It was Walsh's word (mutual flirtation) versus Student #1's (unwanted harassment).[30]

In this case, where credibility was critical and the sanction imposed would result in loss of employment and likely future opportunities in academia, it was important for the Committee to hear from Student #1 and Walsh should have had an opportunity to test Student #1's credibility. The University's interests in protecting victims of sexual harassment and assault are important too. But we are persuaded that the substitute to cross-examination the University provided Walsh—snippets of quotes from Student #1, relayed by the University's investigator—was too filtered to allow Walsh to test the testimony of his accuser and to allow the Committee to evaluate her credibility, particularly here where the Committee did not observe Student #1's testimony. We conclude in this circumstance that the Committee should have heard Student #1's testimony.[31] As Student #1 was a graduate student presumably in her mid-twenties, we believe that being subjected to additional questions from the Committee would not have been

---

[30] This case poses a stark contrast to *Plummer*, 860 F.3d at 770–71, where two students were expelled after sexually assaulting a third student. Video and photos corroborated the allegations, but the third student (too inebriated to recall the events) was neither deposed nor asked to testify at the hearings. *Id.* at 772. We held that cross-examining the amnesiac third student "could [not] have otherwise altered the impact of the videos and photos." *Id.* at 775–76. Neither the third student's testimony nor cross-examination "would have suggested that she consented to the degrading and humiliating depictions of her in the videos and photos," and the testimony "could [not] have otherwise altered the impact of the videos and photos." *Id.* at 776.

[31] Defendants argue that this court should not recognize Walsh's claim because he did not ask to confront Student #1 during the hearing. Walsh's explanation for this is compelling—any attempt to secure testimony would have obviously been futile, as the University had already denied his request to introduce photos of Student #1 in efforts to protect her anonymity. Furthermore, the University denied Walsh during the hearing of the opportunity to have counsel, who could have advised him to preserve any such claim. And in any event, Walsh made his objections to the University's procedures and its violation of his due process clear throughout the hearing.

Case: 19-10785   Document: 00515592543   Page: 14   Date Filed: 10/07/2020
Case 4:17-cv-00323-Y   Document 55   Filed 10/07/20   Page 14 of 19   PageID 2233

No. 19-10785

so unreasonable a burden as to deter her and other similar victims of sexual harassment from coming forward.

We are not persuaded, however, that cross examination of Student #1 by Walsh personally would have significantly increased the probative value of the hearing. Such an effort might well have led to an unhelpful contentious exchange or even a shouting match. Nonetheless, the Committee or its representative should have directly questioned Student #1, after which Walsh should have been permitted to submit questions to the Committee to propound to Student #1.

In this respect, we agree with the position taken by the First Circuit "that due process in the university disciplinary setting requires 'some opportunity for real-time cross-examination, even if only through a hearing panel.'"[32] We stop short of requiring that the questioning of a complaining witness be done by the accused party, as "we have no reason to believe that questioning . . . by a neutral party is so fundamentally flawed as to create a categorically unacceptable risk of erroneous deprivation."[33]

Because we have concluded Walsh suffered a violation of his procedural due process rights, we proceed to the second prong of the qualified immunity analysis: was Walsh's constitutional right clearly established? Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."[34] "This is a demanding standard."[35] "[W]e do not deny immunity unless 'existing

---

[32] *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 69 (1st Cir. 2019) (citation omitted).

[33] *Id.*

[34] *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

[35] *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015).

No. 19-10785

precedent must have placed the . . . constitutional question *beyond debate*.'"[36] Although we do not require a case "*directly* on point . . . there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful."[37] In other words, the "*sine qua non* of the clearly-established inquiry is 'fair warning.'"[38]

    Walsh is correct that we have clearly established that due process for a terminated professor includes "a meaningful opportunity to be heard in his own defense."[39] However, none of our case law speaks directly to the procedures necessary to protect a professor's interest in avoiding career-destruction after being accused of sexual harassment. *Levitt v. University of Texas at El Paso*, our only due process case concerning a professor terminated for sexual harassment, provides us little clarity.[40] In *Levitt*, the University's rules permitted the professor to confront witnesses (though it is unclear if these witnesses included his accusers).[41] The professor alleged the University violated his due process rights in failing to follow its rules; this included the University denying him the right to confront witnesses for two days when he was absent from the hearing due to illness.[42] We held that the University gave the professor all due process to which he was entitled despite its failure to follow its rules.[43] But we did not otherwise address the right to confront witnesses or directly hear from the accuser.

---

[36] *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

[37] *Vincent*, 805 F.3d at 547.

[38] *Swanson*, 659 F.3d at 372 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

[39] *Levitt v. Univ. of Tex. at El Paso*, 759 F.2d 1224, 1228 (5th Cir. 1985).

[40] *Id.* at 1224.

[41] *Id.* at 1226 n.1.

[42] *Id.* at 1229 n.6.

[43] *Id.* at 1229.

Case: 19-10785   Document: 00515592543   Page: 16   Date Filed: 10/07/2020
Case 4:17-cv-00323-Y   Document 55   Filed 10/07/20   Page 16 of 19   PageID 2235

No. 19-10785

The only other analogous case is *Plummer v. University of Houston*, which centered on a university hearing for two students expelled for sexual assault.[44] In that 2017 opinion, we explicitly acknowledged that we have not yet determined "whether confrontation and cross-examination would ever be constitutionally required in student disciplinary proceedings."[45]

Other, less analogous cases from our circuit address the necessity of confrontation in administrative hearings more generally—all prove similarly inconclusive. Our first case addressing the issue of confrontation in university hearings came in 1961, in a suit concerning student expulsion for unidentified misconduct.[46] We held that the right to be heard does *not* require "a full-dress judicial hearing, with the right to cross-examine witnesses."[47] Ten years later, we observed that cross-examination in administrative hearings "depends upon the circumstances."[48]

In 1986, we stated that "[w]hen an administrative termination hearing is required, federal constitutional due process demands either an opportunity for the person charged to confront the witnesses against him and to hear their testimony or a reasonable substitute for that opportunity."[49] The district court relied on this language to conclude that Defendants violated Walsh's constitutional rights, and that those rights were clearly established. Yet this language is dicta—the court was addressing whether the plaintiff had been

---

[44] 860 F.3d at 767.

[45] *Plummer v. Univ. of Houston*, 860 F.3d 767, 775 (5th Cir. 2017), *as revised* (June 26, 2017).

[46] *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150 (5th Cir. 1961).

[47] *Id.* at 159.

[48] *Woodbury v. McKinnon*, 447 F.2d 839, 844 (5th Cir. 1971). In that case, the court held that because of the nature of the charges (professional competence of a terminated doctor) and the nature of the hearing (informal discussion of medical records with no witnesses), cross-examination was not necessary. *Id.*

[49] *Wells v. Dall. Indep. Sch. Dist.*, 793 F.2d 679, 683 (5th Cir. 1986).

Case: 19-10785    Document: 00515592543    Page: 17    Date Filed: 10/07/2020
Case 4:17-cv-00323-Y   Document 55   Filed 10/07/20   Page 17 of 19   PageID 2236

No. 19-10785

advised of the names and nature of the testimony against him, *not* if he had a meaningful opportunity to be heard—and the court did not elaborate on what qualified as a "reasonable substitute."[50]

Five years later, we again emphasized that we had not fully explored the scope of procedural due process guaranteed to terminated faculty members.[51] In that case, plaintiffs requested the right to have presence of counsel, cross-examine adverse witnesses, present evidence, and obtain a written record.[52] We held that in our past faculty termination cases, "the aggrieved instructor was afforded a relatively formal procedure as a matter of state law or institutional policy. We believe that the due process clause, of its force, requires little formality."[53]

Thus, as the above discussion makes clear, before today we have not explicitly held that, in university disciplinary hearings where the outcome depends on credibility, the Due Process Clause demands the opportunity to confront witnesses or some reasonable alternative. Our sister circuits, meanwhile, are split on this issue.[54] And the Department of Education

---

[50] *Id.*

[51] Tex. Faculty Ass'n v. Univ. of Tex. at Dall., 946 F.2d 379 (5th Cir. 1991).

[52] *Id.* at 389.

[53] *Id.* Because the decision to terminate faculty was incident to the termination of an entire academic program, the court found that the right to confront adverse witnesses would do little to aid the truth-seeking process. *Id.*

[54] *Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011) (en banc) ("Where no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established."). The Second, Eighth, and Eleventh Circuits have held that due process does not generally include the opportunity to cross-examine in university proceedings. *See Nash v. Auburn Univ.*, 812 F.2d 655, 664 (11th Cir. 1987); *Riggins v. Bd. of Regents of Univ. of Neb.*, 790 F.2d 707, 712 (8th Cir. 1986); *Winnick v. Manning*, 460 F.2d 545, 549 (2d Cir. 1972) (though noting cross-examination may be essential to a fair hearing when credibility is at issue). The First, Sixth, and Tenth Circuit have held the opposite. *See Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 69 (1st Cir. 2019) (with the caveat that the accused may not be

No. 19-10785

recently revised Title IX regulations to require universities to permit cross-examination of all witnesses, further demonstrating how in flux this right is.[55]

Nor can we hold, as Walsh contends, that "a meaningful opportunity to be heard" should have put Defendants on notice that their actions were unlawful. The clearly established standard "requires a high 'degree of specificity.'"[56] Our case law does not make clear that the University's use of an investigator to interview the accused student and face cross-examination at the hearing violated Walsh's due process rights. Walsh presents us with no binding or persuasive authority for the proposition that the Committee was required to give Walsh the opportunity to test Student #1's version of the events more than it did.

Because of our conflicting, inconclusive language in past cases, we cannot find that Defendants "knowingly violate[d] the law."[57] And, because of all the opportunities Defendants afforded Walsh to be heard, we cannot conclude Defendants were "plainly incompetent" in denying Walsh the right to cross-examine Student #1 or some substitute method to test her testimony.[58] The district court, therefore, erred in denying Defendants' motion for summary judgment on the basis of qualified immunity for these claims.[59]

---

allowed to do the confronting); *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018); *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 517–18 (10th Cir. 1998).

[55] *See Summary of Major Provisions of the Department of Education's Title IX Final Rule*, DEPARTMENT OF EDUCATION (May 13, 2020), page 7, https://www2.ed.gov/about/offices/list/ocr/docs/titleix-summary.pdf.

[56] *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015)).

[57] *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

[58] *Id.*

[59] Walsh also argues that the Committee's refusal to admit four photos taken of Walsh, Student #1, and the other attendees during the evening in question violated his due process rights. The four posed photos depict generally that the attendees were having fun,

No. 19-10785

## III. CONCLUSION

Defendants are entitled to qualified immunity. Therefore, the district court's order denying Defendants' motion for summary judgment on the basis of qualified immunity is REVERSED, and judgment is RENDERED in favor of the Defendants.

---

and one of the photos appears to show Student #1 leaning into Walsh in the group photo. But no record was established about when in the evening the photos were taken in relation to when Walsh's alleged improper behavior occurred. As we noted above, the Committee should have examined Student #1 and given her an opportunity to explain how the photos supported her testimony that she was uncomfortable with Walsh's actions. However, we do not agree with the district court that the Committee's decision to exclude the photos was a violation of Walsh's clearly established due process rights. *See Shawgo v. Spradlin*, 701 F.2d 470, 480 (5th Cir. 1983) (concluding that although the Commission's evidentiary rulings "may indeed have hindered [the plaintiff's] presentation of the defense of selective discipline with respect to conduct that was a common practice in the [Police] Department," the court was "unable to say that the Commission's rulings were arbitrary").

19